**The STATE of Ohio, Appellee,**

**v.**

**STEWART, Appellant.**

[Cite as *State v. Stewart* (1991), 75 Ohio App.3d 141.]

Court of Appeals of Ohio,
Ashtabula County.

No. 89–A–1446.

Decided July 22, 1991.

142

*Gregory J. Brown,* Prosecuting Attorney, and *Michael Franklin,* Assistant Prosecuting Attorney, for appellee.

*Owen C. Neff,* for appellant.

CHRISTLEY, Presiding Judge.

This case comes to us on appeal from a murder conviction under R.C. 2903.02(A) with a firearm specification.

On December 8, 1988, at approximately 9:38 p.m. the Ashtabula Police Department received a telephone call reporting a shooting. Two police officers were dispatched to 213 West 53rd Street.

When the officers arrived at the scene, the victim's mother was outside yelling that her daughter had been shot. The officers entered the home and found appellant, Nathaniel Stewart, Sr., straddling the chest of his wife, the victim. It appeared that appellant was attempting to administer some type of CPR to the bleeding woman. One of the officers asked appellant where the weapon was. Appellant indicated that the gun was located on the bed. The gun was identified as a .38 caliber revolver.

The officers called the ambulance squad. The victim had a gunshot wound in her left temple, but was still faintly breathing. Later the victim was pronounced dead at the hospital.

The patrol officer remained at the scene until the detective, Captain Varckette, arrived. Appellant was brought down to the police station in Captain Varckette's unmarked car. Captain Varckette testified that no conversation took place on the ride to the police station.

At the police station, appellant was taken into a detective's office. Although appellant was not formally under arrest at that time, the officer brought another police officer into the office and advised appellant of his *Miranda* rights. Captain Varckette testified that he went through each specific *Miranda* warning. The captain read each warning out loud while appellant followed along with him. At the end of each one, appellant was asked if he understood each right. Appellant indicated that he did and then marked his initials on the space provided next to each warning. At the end of the form, appellant was asked if he understood his rights, he indicated that he did and signed the form.

After the signing of the *Miranda* warnings, Varckette testified that appellant made a statement to him consisting of the following facts: While the victim was working, appellant had some friends over drinking and playing cards; before the victim came home, the friends left. Appellant and the victim went into their bedroom, he picked up a .38 caliber handgun which he said he was putting away; he also said that things got "wild." He testified that while he was putting the gun away, the gun went off and struck his wife in the head.

Appellant subsequently refused to sign the written statement.

Appellant was arrested and later indicted on aggravated murder pursuant to R.C. 2903.01(A) as well as a firearm specification.

Appellant filed a motion on February 13, 1989 to suppress any statements made by appellant. A hearing on this matter was held on February 17, 1989. On April 4, 1989, the trial court denied appellant's motion to suppress appellant's oral statement.

On April 10, 1989, appellant filed a motion *in limine* pursuant to Evid.R. 803(2). Appellant moved the court to rule on the admissibility of the testimony of the radio dispatcher for the Ashtabula City Police Department concerning a call she received from an unidentified hysterical woman eight minutes before the call from the appellant's and the victim's son reporting the shooting. Supposedly the woman stated "he's got a gun, he's going to kill me." The dispatcher believed the rapidly given address was "213 West 43rd Street." The dispatcher sent a patrol car to that address. There was no such address.

Eight minutes later, the same dispatcher received a call from a young boy stating "my dad shot my mom" giving 213 West 53rd Street as the address.

Oral arguments were heard directly prior to trial on the motion *in limine.* The court indicated if the prosecution could lay the proper foundation, the dispatcher's testimony would be permitted. At trial, the court determined that the testimony was relevant and permitted the dispatcher to testify as to what the unidentified female caller said under the excited utterance exception to the hearsay rule.

After the state presented its case, the trial court determined that there was insufficient evidence of the element of prior calculation and design, and dismissed the aggravated murder charge pursuant to Crim.R. 29. The trial court then permitted the case to go forward on a charge of murder, a lesser included offense.

On April 18, 1989, the jury found appellant guilty of murder under R.C. 2903.02(A). It also found that appellant had a firearm on or about his person when he committed the offense. Subsequently, the trial court entered a judgment on the verdict and sentenced appellant.

Appellant timely filed his notice of appeal asserting the following assignments of error:

"1. The constitutional rights of the defendant were violated in respect to the V, VI, and XIV Amendments to the Constitution of the United States of America and Article I Section 10 of the Constitution of the State of Ohio, in that the court impermissably [*sic*] permitted testimony of self-incrimination.

"2. The court admitted heresay [*sic*] evidence highly prejudicial to the rights of the defendant and violative of the VI Amendment to the Constitution of the United States and Article I Section 10 of the Constitution of the State of Ohio and the XIV Amendment.

"3. The court committed prejudicial error in its charge.

"4. The court erred in failing to provide the defendant with procedural due process under the XIV Amendment to the Constitution of the United States and Article I Section 10 of the State of Ohio."

In appellant's first assignment, he alleges that the warnings given to him when appellant arrived at the police station were totally inadequate under *Miranda v. Arizona* (1966), 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694. The United States Supreme Court stated in *Miranda* that the prosecution may not use statements made by the accused unless it has demonstrated that procedural safeguards against self-incrimination have been secured. *Id.* at 444, 86 S.Ct. at 1612, 16 L.Ed.2d at 706–707. This protection is only guaranteed when the accused is under custodial interrogation. Custodial interrogation was defined as " * * * questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom * * *." *Id.* In a very recent Supreme Court decision, *Arizona v. Fulminante* (1991), 499 U.S. ——, 111 S.Ct. 1246, 113 L.Ed.2d 302, the court held that the failure to follow *Miranda* when soliciting a confession may result in harmless error. Although this could have potentially become an issue in the present case, the trial court in the instant case found that appellant *was advised* of his rights pursuant to *Miranda* before any statement was solicited.

*Miranda* requires:

" * * * Prior to any questioning, the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed. The defendant may waive effectuation of these rights, provided the waiver is made voluntarily, knowingly and intelligently. If, however, he indicates in any manner and at any stage of the process that he wishes to consult with an attorney before speaking there can be no questioning." *Id.*, 384 U.S. at 444–445, 86 S.Ct. at 1612, 16 L.Ed.2d at 706–707).

Basically, appellant challenges the constitutionality of his statement on four grounds: mental state, intoxication, minimal education and psychological coercion.

First appellant claims he was in a state of shock and thus he was not able to make an informed waiver of his *Miranda* rights. Along with this

argument, he asserts he was subjected to psychological coercion. Thus, these two challenges will be considered together. The record does not reveal any evidence demonstrating that appellant was overtly or even covertly coerced in any manner. Appellant voluntarily went to the police station with Captain Varckette. Appellant sat in the front seat of the vehicle without any restraints. Once at the police station, appellant was brought to an unlocked office and was advised of his rights pursuant to *Miranda*.

Appellant does not take issue with any of these facts. Rather, he argues that he was isolated in the captain's office and was not permitted to speak with his father. Appellant states that he was nervous, that he had been drinking earlier, and was a slow learner.

The record does not indicate that appellant was in "shock." Although Captain Varckette testified appellant seemed somewhat nervous, his answers were rational, he responded appropriately and seemed to understand the process. There is no evidence that appellant could not or did not make an informed choice.

Next, appellant asserts that he could not have voluntarily waived his *Miranda* rights because he was intoxicated. In making his argument, appellant points to the suppression hearing where Captain Varckette testified on cross that appellant was intoxicated. Captain Varckette testified that he smelled an odor of alcohol on his breath and that he would presume that appellant would be intoxicated if he had taken a breathalyzer test.

This court has addressed the issue of intoxication and the consumption of alcohol on voluntary waiver of self-incrimination. "The presence of alcohol will not, by itself, make a statement *per se* inadmissible." *State v. Daniel* (Dec. 31, 1990), Trumbull App. No. 89–T–4214, unreported, at 26, 1990 WL 237188.

In applying Federal case law, *Townsend v. Sain* (1963), 372 U.S. 293, 306–308, 83 S.Ct. 745, 754, 9 L.Ed.2d 770, 781–783 and *United States v. Brown* (C.A.8, 1976), 535 F.2d 424, 427, this court formulated a test for such cases: " * * * while the presence of drugs or alcohol should be considered, the amount must sufficiently impair the confessor's abilities to reason." *Daniel, supra,* at 26.

When the court applied the above test to the *Daniel* case, the court concluded that the accused's ability to reason had not been sufficiently impaired to constitute involuntary waiver. There, the amount of alcohol the accused had consumed was in dispute, ranging from one and a half to six beers. Daniel argued he was highly intoxicated, but the trial court found that appellant's will was not overborne by the presence of alcohol. *Id.* at 27.

Accord *State v. Slagle* (June 14, 1990), Cuyahoga App. No. 55759, unreported, 1990 WL 82138.

Appellant, who weighed approximately two hundred forty-five pounds, testified at both the suppression hearing and at trial that he had three shots of alcohol and one beer. He testified that he drank the shots and beer while playing cards between 7:30 p.m. and approximately 9:00 p.m. The interview with Captain Varckette did not begin until 10:10 p.m. At the suppression hearing, appellant testified that he had a clear head. There was, therefore, some competent, credible evidence on this issue, despite conflicting claims.

Given the evidence in the case *sub judice*, the amount of alcohol consumed, which is not in controversy, did not sufficiently impair appellant's abilities to reason.

Thus, if believed, the state's witnesses carried their burden of proof. *State v. Lorraine* (Aug. 10, 1990), Trumbull App. No. 3838, unreported, at 32, 1990 WL 116921.

█ Although appellant argued in his brief that due to his limited intellect he could not have intelligently waived his right against self-incrimination, the evidence before the trial court supported only a finding of low educational achievement rather than low intelligence.

Captain Varckette testified that when appellant advised him that he could not read very well, Varckette went through the pre-interview form line by line with appellant. After each line, he asked appellant if he understood. Varckette said that when appellant answered yes, he was directed to initial the space after each statement. There was also testimony indicating that appellant orally stated he understood. In addition, appellant indicated at the suppression hearing he made the statements of his own free will. At the same hearing, appellant also testified that he remembered an officer reading him the form and that he subsequently initialed at least some of the statements.

Although not directly on point, this court has addressed the issue, on several occasions, of whether a person of limited intellectual abilities can voluntarily and knowingly waive his constitutional rights. *Daniel, supra,* at 20; *State v. Hill* (Nov. 27, 1989), Trumbull App. No. 3720, unreported, at 13–16, 1989 WL 142761; *State v. Mitzel* (Sept. 22, 1989), Trumbull App. No. 3917, unreported, 1989 WL 110827. Reviewing the standard in such cases is useful in analyzing the present case:

" * * * '[S]ubnormal mentality' may be considered in determining whether the confession was 'knowingly' and 'intelligently' made, but that diminished I.Q. will not, in and of itself, negate the waiver and preclude admission.

Examination of all the facts and circumstances in *Mitzel* revealed that the defendant was sufficiently aware of the time, space, geography and environment of his confession, as well as the fact that the persons to whom he was confessing were policemen. The defendant-appellant there was found to be capable of making a 'knowingly' and 'intelligent' waiver of his rights because the totality of the circumstances examined (including the videotaped confession) indicated that defendant-appellant had sufficient understanding to execute a valid waiver, even given the fact that he was of diminished mental capacity." *Daniel, supra,* at 20–21, quoting *Hill, supra,* at 13–14.

In the present case, there was evidence that appellant had low educational achievement rather than limited intelligence. This does not make him incapable of voluntarily waiving his rights. Appellant admitted to only being able to read a "little bit." He indicated that he had attended school through the tenth grade, and was in a slow learning class. He also had problems with his eyes. These factors tend to imply a learning disability rather than a lack of intellect. There was no evidence presented as to appellant's actual I.Q.

On the other hand, appellant admits that he and his wife jointly made financial decisions. A review of the record also demonstrates, as in *Daniel, supra,* that appellant was alert and responsive to his environment. Moreover, there was evidence that appellant had heard and apparently understood his *Miranda* rights on at least one prior occasion. Given the evidence, appellant was capable of intelligently waiving his rights despite his limited ability to read.

In light of the above analysis, the *Miranda* warnings given at the police station were adequate. Thus, the first assignment is without merit.

In appellant's second assignment, he alleges that the admission of two particular hearsay statements violated his constitutional rights. The first statement concerns the dispatcher's testimony that an unidentified woman called and said "He's got a gun. He's going to kill me." She was also permitted to then testify that she received a call from a boy stating "my dad shot my mom." Since the trial court determined that the testimony was relevant, it allowed the testimony as an excited-utterance exception to the hearsay rule.

Evid.R. 801(C) defines hearsay as " * * * a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted."

Although appellee presented several different hearsay exceptions that may be applicable, the record is relatively clear that the trial court only considered the excited-utterance exception. Evid.R. 803 excludes certain statements

from the hearsay rule, including excited utterances as defined in Evid.R. 803(2):

" * * * A statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition."

■ In order for the excited-utterance rule to apply, there must be spontaneity and a lack of an opportunity to engage in reflective thought. *State v. Morrman* (1982), 7 Ohio App.3d 251, 7 OBR 330, 455 N.E.2d 495, paragraph two of the syllabus.

Essentially, the trial court permitted the dispatcher to testify about the unidentified caller based on an Illinois case, *People v. Lang* (1982), 106 Ill.App.3d 808, 62 Ill.Dec. 510, 436 N.E.2d 260. Although the trial court clearly stated that it was not bound by the *Lang* decision, the court found that authority persuasive.

In *Lang*, a police dispatcher was permitted to testify at the murder trial of the victim's husband that she received a telephone call from an unidentified caller who requested that a squad car be sent to a specific address. The unidentified caller stated, "[t]hey're trying to kill me." *Lang, supra*, 106 Ill.App.3d at 810–811, 62 Ill.Dec. at 513, 436 N.E.2d at 263. Approximately five minutes after receiving the call, a deputy sheriff found the victim shot at the couple's home. The accused admitted accidentally shooting his wife. The dispatcher's testimony was permitted based on the excited-utterance exception, because the circumstantial evidence strongly suggested that the victim made the phone call. *Id.*

No Ohio case law on this point has been found. In addition to the Illinois case law, there is also a California case that is relevant, if not on all fours, *People v. Garcia* (1986), 178 Cal.App.3d 814, 817–818, 224 Cal.Rptr. 198, 200. There, in a murder prosecution, the victim's fiance testified that the victim phoned him and stated that the accused "went crazy and he's going to shoot me." The statement was admitted pursuant to California's spontaneous declarations exception to the hearsay rule which contains almost exactly the same language as the Ohio excited-utterance exception. The *Garcia* court found the following factors persuasive: The statement was virtually the victim's last sentence, the accused and the victim were together at the accused's home, the victim sounded frightened when making the statement, the witness while on the phone with the victim heard angry yelling before the phone went dead, the phone was in the kitchen, the victim's body was found on the kitchen floor, and a spent shell casing was found in the kitchen.

When comparing these facts to the present facts, the dispatcher's testimony concerning the unidentified caller's statement also fell within the excited-utterance exception. This was demonstrated when the trial court required appellee to lay a foundation before permitting this testimony. She testified that the unidentified caller was crying and hysterical; there was no such address as 213 West 43rd Street in Ashtabula, Ohio; there was no reported disturbance on West 43rd Street on December 8, 1988; a young boy called the police at 9:38 p.m. stating "my dad shot my mom," and gave 213 West 53rd Street as the address; the police officers found the victim shot at approximately 9:40 p.m. at 213 West 53rd Street; and no one else at that address called the police. As such, there were enough circumstantial facts to make the required nexus as to relevance and the excited utterance exception.

The trial court determined that:

" * * * [T]he circumstantial evidence was strong enough to permit the jury, * * * to draw the inference that it was Debbie Stewart in this case making the call if they choose to make that inference."

In addition to the foundation laid by the prosecution, the court considered other circumstantial evidence, including the presence of a telephone in the bedroom where the victim was found.

■ Finally, appellant contends that the admission of the unidentified caller violated his constitutional right to confront the witness. The admission of an excited utterance under Evid.R. 803(2) does not violate such rights. *State v. Fowler* (1985), 27 Ohio App.3d 149, 152, 27 OBR 182, 184–185, 500 N.E.2d 390, 393. There is a strong line of federal cases establishing that a valid exception to the hearsay rule does not violate an accused's confrontation rights. *Fowler, supra,* citing *Mattox v. United States* (1895), 156 U.S. 237, 15 S.Ct. 337, 39 L.Ed. 409; *Dutton v. Evans* (1970), 400 U.S. 74, 91 S.Ct. 210, 27 L.Ed.2d 213; *California v. Green* (1970), 399 U.S. 149, 90 S.Ct. 1930, 26 L.Ed.2d 489; *United States v. Kelly* (C.A.2, 1965), 349 F.2d 720.

Given the above facts, the trial court did not err in concluding that the circumstantial evidence was strong enough to permit the jury to make the inference that it was the victim making the call. Therefore, the admission of the dispatcher's testimony recounting the unidentified caller was not error.

■ Turning now to the second hearsay issue to which appellant objects, appellant claims that the trial court erred in permitting the victim's co-worker, Kristi Jean Orth, to testify on rebuttal as to a statement allegedly made by the victim the day before the incident. Orth testified the victim stated "That fucking nigger is not going to get away with it." The balance of her

testimony indicated that the family had received free meat from a church group and that appellant had sold it.

In permitting Orth's testimony, the court seemed to be blending two different legal theories: state of mind and impeachment. We will consider each theory separately. First we will address the state-of-mind exception. The court allowed the statement " * * * as an exception to the hearsay rule under the state of mind exception to show that state of mind of [the victim] at least a day before her death and to show that there was some marital disharmony in the house."

Appellant argued that the state of mind of the victim was not at issue as it was not relevant and that his constitutional right of confrontation was violated.

The state-of-mind exception is defined in Evid.R. 803(3):

*"Then existing, mental, emotional, or physical condition.* A statement of the declarant's then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain, and bodily health), but not including a statement of memory or belief to prove the fact remembered or believed * * *." (Emphasis added.)

The Ohio Supreme Court has held that a legitimate hearsay exception is created when testimony of state-of-mind witnesses is introduced to demonstrate that the victim was scared, anxious, or in other any state reflecting his then existing mental or emotional condition. That testimony can be properly admitted as long as it goes toward the future rather than the past. Further, the testimony *cannot* include an explanation as to *why* the declarant was of that particular state of mind. *State v. Apanovitch* (1987), 33 Ohio St.3d 19, 21, 514 N.E.2d 394, 397–398, citing *United States v. Cohen* (C.A.5, 1980), 631 F.2d 1223.

We would note that the contested statement is hardly an expression of fear by the declarant, however, it certainly is an expression of anger and as such qualifies as a state of mind. Nevertheless, it also went far beyond the status of the victim's state of mind and gave the reasons for the victim's anger. *Apanovitch* also cites *Shepard v. United States* (1933), 290 U.S. 96, 54 S.Ct. 22, 78 L.Ed. 196, to the effect that "[w]hen the state of mind is *relevant* it may be proved by contemporaneous declarations of feeling or intent." (Emphasis added.) *Apanovitch, supra,* at 21–22, 514 N.E.2d at 397–399. Thus, it is important to preface the introduction of this kind of hearsay with a showing of relevancy.

We find the relevancy of Orth's statement to be so weak as to be nonexistent. This is not the case of the victim who feels she has reason to be

afraid. To the contrary, it would seem that the victim was clearly not afraid. The only relevancy in the statement's value was in either impeaching the appellant or in showing his bad character, *i.e.*, his propensity to act in a socially unacceptable manner.

■ Turning now to the impeachment theory, the prosecution's position at trial and now on appeal was that because appellant was allowed to testify that the victim and appellant were a happy couple and were especially pleased about getting a credit card when the incident occurred, rebuttal testimony to the contrary was admissible.

■ However, a witness's credibility may *not* be impeached by *extrinsic* proof of specific instances of his conduct. *State v. Kamel* (1984), 12 Ohio St.3d 306, 12 OBR 378, 466 N.E.2d 860, paragraph two of the syllabus; Evid.R. 608(B). "Such conduct may be inquired into only by the intrinsic means of cross-examination. * * *" *Kamel, supra,* at paragraph two of the syllabus.

*Kamel* is squarely on point. There, the defendant was asked on cross-examination if he had ever grabbed any of his children by the ear and slapped them in the face. The defendant specifically denied doing so. In rebuttal, the state called a witness who testified he saw the defendant do so three to four years earlier. The Ohio Supreme Court found this to be inadmissible under either Evid.R. 404(B) or Evid.R. 608(B).

■ The trial court erred in admitting Orth's testimony. However, when looking at the evidence as a whole, this testimony was not prejudicial as it was essentially cumulative to other evidence and testimony not appealed from, which showed that the marriage was of less than storybook caliber.

Specifically, another co-worker, Mary Alice Lewandowski, testified that on the day of the incident, she overheard the victim speaking on the telephone to her husband. Lewandowski testified that the victim was upset. The victim's sister, June Ludwick, also testified that she was aware that the marriage had difficulties and controversies. That sister testified, on the day the victim was shot, she saw the victim and observed that the victim was upset. The victim's brother-in-law, Robert Floyd Ludwick, testified that on the day the shooting occurred, the victim seemed "terse" and "snappy." Moreover, appellant, himself, testified that the victim had moved out on several occasions.

Between the nature of Orth's testimony and the extent of the testimony going to the victim's emotional state, Orth's testimony was, at most, harmless error.

Thus, this assignment fails.

In appellant's third assignment of error, he alleges that the trial court committed prejudicial error in its charge. Appellant further divides this assignment into three subparts. In subpart (A), appellant alleges· the court erred in refusing to charge on lesser included offenses other than murder.

Specifically, appellant argues that at trial he urged the trial court to include a charge on negligent homicide. Appellant contends that negligent homicide, R.C. 2945.74, is a lesser included offense of murder. In making his argument, appellant cites case law which this court simply does not find persuasive.

In a recent Supreme Court case, *State v. Koss* (1990), 49 Ohio St.3d 213, 219, 551 N.E.2d 970, 975, the court clearly holds that "negligent homicide is *not* a lesser included offense of murder." (Emphasis added.) The *Koss* court used the three-part test set forth ·in *State v. Deem* (1988), 40 Ohio St.3d 205, 533 N.E.2d 294, to define a lesser included offense of another offense. Those three prongs, all of which must be met, are:

" * * * (i) the offense carries a lesser penalty than the other; (ii) the greater offense cannot, as statutorily defined, ever be committed without the lesser offense, as statutorily defined, also being committed; and (iii) some element of the greater offense is not required to prove the commission of the lesser offense." *Koss, supra,* 49 Ohio St.3d at 218, 551 N.E.2d at 975, quoting *Deem, supra.*

R.C. 2903.02 defines "murder" as:

"(A) No person shall purposely cause the death of another.

"(B) Whoever violates this section is guilty of murder, and shall be punished as provided in section 2929.02 of the Revised Code."

R.C. 2903.05 defines "negligent homicide" as:

"(A) No person shall negligently cause the death of another by means of a deadly weapon or dangerous ordnance as defined in section 2923.11 of the Revised Code.

"(B) Whoever violates this section is guilty of negligent homicide, a misdemeanor of the first degree."

When applying the *Deem* test to these two offenses, the *Koss* court found that negligent homicide was not a lesser included offense of murder. See, also, *State v. Gay* (Nov. 2, 1990), Portage App. No. 89–P–2043, unreported, 1990 WL 170682. Although the first prong requesting a lesser penalty applied to negligent homicide, the second prong was not met. The *Koss* court concluded that one can purposely cause the death of another by means other than by a deadly weapon or dangerous ordnance. "Therefore, because negligent homicide is not always and 'necessarily included in' murder, we [the

Ohio Supreme Court] hold that negligent homicide is not a lesser included offense of murder." *Id.,* 49 Ohio St.3d at 219, 551 N.E.2d at 975. Based on this analysis, the Supreme Court concluded that the trial court properly refused to instruct on negligent homicide as a lesser included offense of murder.

In following the Supreme Court's holding in *Koss,* the trial court did not err in refusing to charge the jury on negligent homicide.

█ In subpart (B) of appellant's third assignment, he alleges that the court failed to charge on the motive inducing the act causing the death. The charge which appellant takes issue with is:

"However, proof of motive is not required. The presence or absence of motive is one of the circumstances bearing upon purpose. Where an act is a crime, a good motive or purpose is not a defense."

As appellee correctly notes, appellant did not object to this instruction or request a special instruction. Crim.R. 30(A) states:

" * * * A party may not assign as error the giving or failure to give any instructions unless he objects thereto before the jury retires to consider its verdict, stating specifically the matter to which he objects and the grounds of his objection. * * * "

An appellate court need not consider an error which a party could have brought to the trial court's attention when the error could have been avoided or corrected, but did not. *State v. Williams* (1977), 51 Ohio St.2d 112, 5 O.O.3d 98, 364 N.E.2d 1364, paragraph one of the syllabus.

"In the absence of plain error, under Crim.R. 52(B), an appellate court will not review alleged errors in the giving or failure to give instructions to a jury, unless the party objects thereto before the jury retires to consider its verdict, pursuant to Crim.R. 30." *State v. Lockett* (1976), 49 Ohio St.2d 48, 3 O.O.3d 27, 358 N.E.2d 1062, at paragraph five of the syllabus.

In such situations, plain error occurs where " * * * but for the error, the outcome of the trial *clearly* would have been otherwise." (Emphasis added.) *State v. Underwood* (1983), 3 Ohio St.3d 12, 3 OBR 360, 444 N.E.2d 1332, syllabus; see, also, *State v. Cooperrider* (1983), 4 Ohio St.3d 226, 227, 4 OBR 580, 580–581, 448 N.E.2d 452, 453. Furthermore, both the *Underwood* and the *Cooperrider* courts noted that the plain-error rule should be applied with the utmost caution and should be invoked only to prevent a clear miscarriage of justice.

However, in the present case, motive is *not* an essential element of murder. Moreover, the trial court did give as part of its instruction "the presence or absence of motive is one of the circumstances bearing upon purpose." Thus, the jury was at least instructed in some manner to consider motive.

Therefore, this is not one of those situations constituting plain error, and subpart (B) of the assignment fails.

Finally, subpart (C) of the third assignment alleges that prejudicial error occurred when the court failed to charge on evidence admitted under exceptions to the hearsay doctrine. Although the appellant accurately notes the trial court's hesitancy in admitting the victim's co-worker's testimony, this does not constitute error.

Furthermore, appellee correctly brought this court's attention to the cautionary instruction that was given to the jury directly prior to the co-worker's testimony:

"Ladies and gentlemen of the Jury, the Court is going to permit some questions that I expect to be asked here in a few minutes dealing with statements that the decedent, Debbie Stewart, may have made to this witness.

"I must caution you in advance that this is limited-purpose testimony. This testimony is admitted under an exception to the hearsay rule, which I don't need to explain to you. But I will say to you that it's admitted for the sole purpose of showing or attempting to show the state of mind of Debbie Stewart, and it's not admissible for any other purpose. So, keep that in mind."

Crim.R. 30(B) provides cautionary instruction may be given "[a]t the commencement and during the course of the trial." The cautionary instruction given by the trial court was adequate. Therefore, this part of the error is meritless.

Since none of the three issues has merit, the entire third assignment fails.

In appellant's fourth assignment, he alleges that the trial court erred by failing to provide appellant with procedural due process. In particular, appellant alleges that multiple judicial errors occurred, which individually were not prejudicial, but, as a whole, deprived appellant of a fair trial.

The first of these supposed judicial errors occurred when the court first announced to the jury panel that "[t]his is a case of aggravated murder," and that appellee in voir dire and in its opening statement referred to "aggravated murder" numerous times.

It is well worth noting that appellant was, indeed, indicted by the grand jury for aggravated murder. Moreover, appellant's brief is misleading in that the court's first announcement was not "this is a case of aggravated murder." First, the court greeted the jury and introduced some of the participants in this case. After some other comments, three transcript pages in all, the court finally stated:

"The case that's called for trial this morning is a criminal case. The name of the charge that's been filed by the State and the defendant has been accused of committing is the crime of Aggravated Murder."

The trial court also told the jury "[t]he law presumes that everyone charged with a crime is innocent, until his guilt is proven beyond a reasonable doubt."

After the state rested its case, the court struck the prior calculations and design charge. Contrary to what appellant states in his brief, the trial court did tell the jury that the element of prior calculation and design had been withdrawn and was no longer before the jury for consideration. At the end of trial, the jury was only given the murder instruction. We find no error.

Second, appellant alleges the court erred in some unarticulated manner by permitting witnesses to be photographed during trial. Appellant has failed to substantiate this charge via any relevant authority or failed to show how these actions in any way prejudiced him. We find no error.

Third, appellant challenges the testimony of two of the state's expert witnesses. Both witnesses qualified under Evid.R. 702 as experts. To qualify as an expert testimony, the following is required pursuant to Evid.R. 702:

"If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise."

Jeff C. Brown was the Chief Investigator and Administrator of the Ashtabula County Coroner's Office. Brown received specialized training in associating anatomical injuries with the mechanics or force of infliction involved.

Dr. Challener, a deputy coroner, also is an expert. Besides his medical qualifications in forensic pathology, he had performed numerous autopsies in which a gunshot wound was the cause of death.

Appellant, during cross-examination, attempted to impeach both these witnesses. It was for the jury to determine the weight to be given to their testimony. We find no error.

158

Fourth, appellant alleges error when the trial court permitted the state to impeach its own witness, Nathaniel Stewart, Jr., the son of appellant and the victim. It is not clear from appellant's argument how appellee impeached Nathaniel Stewart, Jr. Although appellee redirected after appellant's cross-examination, it appears appellee was clarifying rather than impeaching. We find no error.

Fifth, appellant reasserts the testimony of the dispatcher. This alleged error was fully addressed in assignment number two.

■ Sixth, appellant alleges that the commotion in the court required a mistrial where spectators demanded a mistrial because there were no blacks on the jury. The judge was concerned about this outburst and pointed out to the jurors that appellant was not responsible for nor did he participate in the outburst.

Likewise, the seventh alleged error claims that the jurors were intimidated or that they held appellant in an unfavorable light because the jurors were given increased protection while at lunch because of the above outburst. There is no demonstration that this was other than speculation. It appears that the trial court acted responsibly to ensure appellant would not be blamed for the incident and that the jurors would not be unnecessarily exposed to harassment or intimidation.

■ Finally, appellant alleges that the state's last witness, Larry McFarland, should not have been able to testify, because he had hallucinations and had been drinking when the appellant supposedly made the statement that appellant would "blow her [the victim's] head off." Appellant had the opportunity and adequately impeached the witness's testimony. Appellant's counsel also commented on the weight that should be given to his testimony. Since McFarland's testimony was relevant and material, it was admissible.

Thus, taken as a whole, these last eight "judicial errors" did not deny due process to appellant and are without merit.

The judgment of the trial court is affirmed.

*Judgment affirmed.*

HENDRICKSON and BASINGER, JJ., concur.

WILLIAM R. HENDRICKSON, J., retired, of the Twelfth Appellate District, and RANDALL L. BASINGER, J., of the Putnam County Court of Common Pleas, sitting by assignment.

BASINGER, Judge, concurring.

While agreeing that we should affirm the defendant's conviction, I disagree as to the finding of error, albeit not prejudicial, in the admission of certain statements of the victim as addressed in the second assignment of error.

In the second of two hearsay issues raised in said assignment of error, appellant claims that the trial court erred in permitting the victim's co-worker to testify on rebuttal as to a statement allegedly made by the victim the day before the incident. Kristi Jean Orth testified that the victim stated, "That fucking nigger is not going to get away with it." This court finds the statement to be inadmissible yet affirms the conviction upon the finding that the admission of the testimony was not prejudicial. I would find that the trial court properly admitted the statement in question.

The appellant, first of all, testified that he and his wife "always got along good." This statement as well as the allegations of the indictment and the defense thereto put into issue the relationship of the victim and the appellant and provide a basis for relevancy as to the statement in question.

The state-of-mind exception is defined in Evid.R. 803(3):

"Then existing, mental, emotional, or physical condition. A statement of the declarant's then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain, and bodily health), but not including a statement of memory or belief to prove the fact remembered or believed * * *."

Under certain circumstances a victim's relevant hearsay statements have been properly admitted in Ohio as an exception under Evid.R. 803(3). In *State v. Apanovitch* (1987), 33 Ohio St.3d 19, 21, 514 N.E.2d 394, 397–398, admissions of a victim were found to be admissible as legitimate state of mind exceptions pursuant to Evid.R. 803(11). Similarly, the victim's state of mind in the case *sub judice* is relevant. I would, therefore, find that the admission of the statement was an exception under Evid.R. 803(3). The statement was therefore not inadmissible hearsay and was properly admitted.